1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF DELAWARE

3

4    VENTRONICS SYSTEMS LLC         :    CA NO. 11-1114-RGA

5                                    :    March 27, 2012

6            Plaintiff,      :

7                                    :    1:30 O'clock p.m.

8    v.                              :

9                                    :

10   DRAEGER MEDICAL, GmbH, et al :

11                                   :

12           Defendants,     :

13   .............................:

14

15

16        TRANSCRIPT OF MOTION TO SEVER AND MOTION TO STAY

17           BEFORE THE HONORABLE RICHARD G. ANDREWS

18               UNITED STATES DISTRICT JUDGE

19

20

21   APPEARANCES:

22

23   For Plaintiff:     MORRIS, NICHOLS, ARSHT & TUNNELL

24                      BY:  KAREN JACOBS LOUDEN, ESQ

25                           -and-

```
 1                         KL GATES  B:  JOHN J. COTTER, ESQ

 2

 3

 4    For Defendants:      SEITZ ROSS ARONSTAM & MORITZ

 5                         BY:  COLLINS J. SEITZ, JR., ESQ

 6                              -and-

 7                         WILMER HALE

 8                         BY:  MICHAEL J. SUMMERSGILL, ESQ

 9                         BY:  ARTHUR J. COVIELLO, ESQ

10                         BY:  TODD C. ZUBLER, ESQ

11                         For Defendant Hamilton

12

13                         POTTER, ANDERSON & CORROON

14                         BY:  RICHARD L. HORWITZ,ESQ

15                         -and-

16                         P. ANDREW RILEY, ESQ

17                         J. MICHAEL JAKES, ESQ

18                         For Defendant Maquet

19

20                         POTTER, ANDERSON & CORROON

21                         BY:  RICHARD L. HORWITZ, ESQ

22                              -and-

23                         THE JONES IP GROUP

24                         BY:  WAYNE A. JONES, ESQ

25                         BY:  DUSTY S. VOGELPOHL, ESQ
```

1                         For Defendant Draeger

2

3

4

5     Court Reporter:          LEONARD A. DIBBS

6                              Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                       P R O C E E D I N G S

3

4              THE COURT:  Good afternoon.  Please be seated.

5              This is the time scheduled for argument in Ventronics

6    Systems versus Draeger Medical, Hamilton and Maquet, Civil

7    Action, Civil Action Number 11-1114.

8              So I've got defense motions that are primarily filed by

9    Hamilton and Maquet.

10             And I see Draeger joined in.  And my impression was,

11   but you tell me between Hamilton and Maquet, who is sort of in

12   the lead on this?

13             MR. SEITZ:  C. J. Seitz.  I think with the Court's

14   permission, Mr. Summersgill for Hamilton is going to be making

15   the argument.

16             THE COURT:  That will be fine.

17             I would like to find out who else is here.

18             I see Ms. Louden is here.  And you've got Mr. Cotter

19   with you?

20             MS. LOUDEN:  Yes, your Honor.

21             MR. COTTER:  Good afternoon, your Honor.

22             THE COURT:  Have I seen you before?

23             MR. COTTER:  You have not.

24             THE COURT:  Where are you from?

25             MR. COTTER:  Boston.

1          THE COURT:  Welcome.

2          MR. COTTER:  Thank you.

3          Mr. Seitz, you've got people beside Mr. Summersgill.

4   Mr.  Zubler?

5          MR. SEITZ:  Todd Zubler, your Honor.

6          THE COURT:  Where are you all from?

7          MR. SEITZ:  From Boston and Washington.

8          Mr. Horwitz, yes.

9          MR. HORWITZ:  Good afternoon, your Honor.

10          I've got people from the West Coast and from

11   Washington.  At counsel table is Andrew Riley.  Andrew Riley is

12   for Maquet and Wayne Jones is for Draeger.

13          THE COURT:  Okay.

14          MR. HORWITZ:  Then back here for Maquet is Michael

15   Jakes and Dusty Vogelpohl is for Draeger.

16          THE COURT:  I know Mr. Jones.  I've seen you before.

17          All right.  So, let's just talk about the Motion for

18   Severance first, Mr. Summersgill.

19          So, I was wondering, if I granted the severance to you,

20   how would you envision that this all would proceed?

21          MR. SUMMERSGILL:  Your Honor, we think as we indicated

22   in the papers, we think it should be severed now and proceeding

23   in three separate litigations.  We don't think that there is any

24   basis to sever later as you find that the same transaction has

25   not been met.

1          THE COURT:  I understand that.

2          Under your three parallel proceedings, when we get to a

3    claims construction hearing, how many claim construction

4    hearings do I have?

5          MR. SUMMERSGILL:  Your Honor, I think that's a very

6    fair point.

7          Usually claim construction is raised as one of sort of

8    the primary grounds for why severance should be granted in

9    pretrial proceedings.

10          I think you would have to hold three separate claim

11    construction hearings.  The argument that a claim construction

12    hearing in cases covering the same patents just by joinder would

13    mean that every multi-defendant case would be joined.

14          THE COURT:  No, no.  Let's assume that there is

15    severance.  Your view is that if there is severance, then it's

16    just three separate proceedings and if there's a great

17    similarity between the arguments on the patents that you have in

18    common that are raised, I just do that three times?

19          MR. SUMMERSGILL:  Your Honor, I think we need to have

20    three separate hearings because the parties will emphasize, may

21    want different terms construed, will have different arguments

22    for those terms.  We have different non-infringement

23    arrangements which impact the claim construction process

24    differently.

25          That doesn't mean that you couldn't receive the

1   arguments from all three separate cases and then make a decision

2   to ensure consistency.

3        There's a real reason why combining into a single claim

4   construction would harm the defendants.  That is because either

5   we're forced to compromise our positions or we're forced to take

6   inconsistent positions and Ventronics will then try to exploit

7   that.

8        THE COURT:  If we do it separately, and you take

9   inconsistent positions, I'm still going to have to construe a

10  particular claim the same way in all three cases, right?

11       But maybe in your case versus Ventronics, your argument

12  means X and maybe one of the other parties arguments means Y, so

13  I have a hearing with you and you're arguing X and Ventronics is

14  arguing whatever, A, then I rule Y because I like their argument

15  in the other case better than either of your arguments.

16       MR. SUMMERSGILL:  That's a fair point, your Honor.

17  That inconsistency could exist across separate litigation, just

18  like it could an in any separate litigation.  There is a little

19  bit less of a pressure on the defendants to try to compromise.

20  When it's in a separate litigation, there's a little bit less

21  punch to an inconsistency that is presented.

22       THE COURT:  If I had three separate cases going on,

23  could I have one claim construction hearing with all four of

24  you, and instead of having you argue this and you argue this, it

25  could be you argue this, you argue this, you argue this and you

1    argue that?

2         MR. SUMMERSGILL:  If the claim construction hearing

3    were effectively set up so that it's three separate hearings

4    combined into one so that we get the full amount -- Hamilton

5    gets the full amount of time that it would ordinarily get to

6    argue its position and Maquet the same and Draeger gets the

7    same, then that's a possible resolution.

8         Your Honor, I guess I come back to -- if the Rule 20

9    same transaction test is not met, and we don't believe it is,

10   and we don't think it's a close call, the rule says that the

11   parties can't be joined in the same lawsuit.

12        The Rule 20, that's the Phillips case.  And that's the

13   America Invents Act.

14        THE COURT:  I don't think the America Invents Act is

15   retroactive?

16        MR. SUMMERSGILL:  The America Invents Act is not

17   retroactive.

18        But what the America Invents Act says is that the

19   minority construction adopted by the line of cases in the Texas

20   courts, a line of cases, and the cases that the plaintiffs have

21   relied on, that the construction, that this is their language,

22   Congress' language, the construction adopted in that line of

23   cases is expressly abrogated.

24        THE COURT:  They are not the Court.  They can't

25   abrogate it like the Court of appeals could?

1          MR. SUMMERSGILL:  Fair enough, your Honor.  I think

2     it's relevant to what the proper construction of Rule 20 is.

3          And the overwhelming majority of Courts across the

4     country have adopted the construction of Rule 20 that requires a

5     two part test.  First, that you meet the same transaction.

6     Second, that there are common facts.

7          The Texas line of cases says there has to be some

8     common facts.  They combine the two factors.

9          So while the AIA is not retroactive, we do believe it's

10    relevant to the proper construction of Rule 20 as it exists now

11    and prior to the adoption of the AIA.

12          THE COURT:  All right.  I understand your argument on

13    the merits, so to speak.

14          Is there anything else in terms of practical effects,

15    because one of the tings even if I grant what you're requesting,

16    can't I under Rule 42 sort of get to the same place where we are

17    right now, which is the cases are effectively joined together?

18          MR. SUMMERSGILL:  Your Honor, two questions.  I'll

19    start with the Rule 42 question first and then move on to the

20    practical effects.

21          THE COURT:  Fine.

22          MR. SUMMERSGILL:  I don't think that it would be proper

23    if you find that the claims don't arise out of the same

24    transaction to then effectively consolidate the cases.

25          THE COURT:  Under Rule 42, the standard is less

1    demanding that than the joinder standing of Rule 20?

2            MR. SUMMERSGILL:  It is.  But Rule 42 is under the

3    trial section of the Federal Rules.

4            I think that Rule 42 is directed more toward trial

5    consolidation than pretrial proceedings.

6            They could move for MDL consolidation, which many of

7    the non-practicing entities are now doing once they have been

8    severed by courts.

9            And that's a different issue.  I don't think --

10           THE COURT:  That is sort of strange to have an MDL

11   consolidation when all three cases would be in front of one

12   Judge in one district to begin with.

13           MR. SUMMERSGILL:  I agree with you.  I'm actually

14   opposing an MDL consolidation on Thursday with the plaintiff

15   trying to consolidate in front of Judge Sleet.  We'll let you

16   know how it goes.

17           THE COURT:  All right.

18           MR. SUMMERSGILL:  If you decide that the same

19   transaction test is not met, then turn around and accomplish the

20   same thing through Rule 42.  I don't think that's what Rule 42

21   contemplated.

22           THE COURT:  But what you really want from me today is

23   for me to grant the severance?  If I thought Rule 42 were

24   applicable, you all could brief that and that could be decided

25   at a different time, right?

1        MR. SUMMERSGILL:  Yes, your Honor.

2        THE COURT:  Okay.

3        MR. SUMMERSGILL:  There are a number of -- from our

4   perspective, there are many practical harms associated with

5   being joined with unrelated parties.

6        I'll give three examples.

7        THE COURT:  Give me three examples.  I think I sort of

8   got that from your briefing, but go ahead.

9        MR. SUMMERSGILL:  One is the shared deposition time.

10       Even if the deposition of their inventor, for instance,

11   is two days.  Hamilton gets half the normal time allotted to

12   depose their inventor.  That's a major deposition for us.

13       THE COURT:  Well, let's assume there are three of you.

14   Let's assume there are twenty of you.  Would that mean under

15   your theory that the inventor gets deposed twenty times?

16       MR. SUMMERSGILL:  I think you could work out a

17   reasonable accommodation.

18       THE COURT:  When you say you could work out, that would

19   be you all work it out, not me?

20       MR. SUMMERSGILL:  Fair enough, your Honor.  The parties

21   should be willing to work out a reasonable accomodation.

22       But in this case, we've got a Scheduling Order that

23   would limit us to, I think, a third of the time we would

24   normally be allocated under the Federal Rules.  It's just based

25   on the Scheduling Order that we had in Texas.  And that's just

1    sort of a practical necessity of when you join parties.

2          That would be fine if the parties were related, if we

3    had similar or the same products, but we don't.

4          We've got three different defense teams with different

5    products and different approaches.  And we have great lawyers

6    representing the other defendants but with very different

7    interests.  That's one.

8          The second piece is, we're forced to share other

9    discovery under the Scheduling Order.  For instance, we're

10   forced to share three out of five experts with the other

11   defendants.  And this would cause us harm in three ways.

12         One --

13         THE COURT:  Actually, when you say share three out of

14   five experts, I'm not sure I know what you're talking about.

15         MR. SUMMERSGILL:  Three out of five testifying experts.

16   We're allowed under the Scheduling Order, we're allowed as a

17   group a certain number of experts.

18         It would be practically required to share certain

19   experts wanted.

20         THE COURT:  I don't remember doing that.  Was that

21   something ruled that I adopted without knowing that I was doing

22   that?

23         MR. SUMMERSGILL:  It originated in the Texas Scheduling

24   Order, yes, your Honor.

25         Again, it's something that is relatively standard for

1    cases where you have multiple defendants so you don't have ten

2    different actions.

3         THE COURT:  Did you bring this up at the Rule 16

4    Conference?

5         MR. SUMMERSGILL:  I didn't bring the specific expert up

6    at the Rule 16 Conference.  I did mention that it was all

7    subject to our argument that we would be making on the Motion to

8    Sever.  And the example I gave you at the Rule 16 Conference

9    Scheduling Order was the deposition, that would be forced to

10   share time with the inventor.  So the sharing of experts would

11   harm us in a couple of ways.

12        One, we've got to agree with the other defendants.

13        THE COURT:  I can understand that.  I didn't know that

14   I had participated in doing that.

15        MR. SUMMERSGILL:  And then the third thing, larger

16   point, inevitably, we're forced to make comprises among the

17   defendants that we wouldn't otherwise make.

18        And in a claim construction as an example, we submitted

19   one set of terms and constructions down in Texas.

20        And I will tell you, I can't obviously go into the

21   details without waiving privileges.

22        But when we started the process, we were not all in

23   agreement.  The Wilmer Hale team was in agreement.  The Maquet

24   and the Draeger lawyers were separately in agreement on their

25   internal teams.  And we had to compromise, otherwise we faced

1    inconsistent positions that they could exploit.

2          That's not limited to claim construction.  That will be

3    throughout the litigation.  I think those are the examples of

4    the harm of joining unrelated parties.

5          It's only brought on because Ventronics -- it is more

6    convenient for Ventronics to sue three entities at once.

7          THE COURT:  All right.  I think I got your position.

8    Let me hear from the plaintiff.

9          MR. SUMMERSGILL:  Mr. Riley from Maquet has indicated

10   that he wanted to be heard on these issues.

11         THE COURT:  I'm going to pass over him and go to Mr.

12   Cotter.

13         THE COURT:  Good afternoon.

14         MR. COTTER:  Good afternoon, Judge Andrews.  Thank you.

15         I guess I'll try to start with where they finished off,

16   as I know that's what I remember best.

17         Talking about the shared deposition time.  They had an

18   opportunity to say, we can't agree to the schedule based on the

19   limitations of Texas and we need more time.  They didn't do

20   that.  Instead, we reached agreement on the schedule.

21         As far as, you know, even the inventor time they have.

22   I don't know, but maybe their point is they should be able to

23   depose the inventor each for days and days on end.  I think that

24   is indicative of what they are thinking of doing.  They want to

25   split the case up.  And they want to go at it and make it as

1    expensive and time consuming as possible as they can for the

2    plaintiff.

3         And their complaints about -- and that goes for Maquet

4    also and Draeger in joining, complaints about not having enough

5    time with the inventors.

6         As I understand the order, what we have is a situation

7    whereby the defendants' own admission they get three hours each

8    per inventor.  I believe there is actually more time than that

9    because not only do they get the three hours each per inventor

10   because there are three inventors on the '160 patent.  They also

11   get additional time to depose the inventors on other issues.

12        I can't define those specifically without looking at

13   the Scheduling Order.  But they get significant other time with

14   the inventors.

15        So to say that nine hours or three hours each is not

16   enough, strikes me as not exactly fitting with what it takes to

17   depose an inventor.

18        Second of all, they have got a lot more time than

19   individually and collectively.

20        As far as are being forced to share other discovery,

21   they have been able to get along so far.

22        Mr. Summersgill alluded to some agreement or not with

23   regard to Markman claim construction.  All I know is, I look at

24   the three parties, defendants' claim construction positions and

25   there are many similarities.  There are definitely are some

1     differences, but there are lots of similarities.

2          I don't where they were in a position where they

3     couldn't decide to take their own route if they wanted to

4     before, no one was stopping them from doing that, but they don't

5     do it.

6          As far as the sharing of experts.  Again, just like the

7     inventor deposition situation, how many experts do they need?

8     Apparently they need enough -- they need more than three.

9     Excuse me, more than two of their own along with the other three

10    shared.  So they are saying they need more than five experts, I

11    guess, in the case against the three defendants, or if it's

12    split up, they need more than five experts.

13         I guess you could make up some reasons why they need an

14    expert for this particular fact and that particular area.  But

15    again, it gets to how much do they need?  What are they trying

16    to do here?  What they are trying to do is increase the expenses

17    and delay the decision in the case.

18         As far as compromising in claim construction, as you

19    pointed out, your Honor, in the hearing earlier, that's going to

20    have to be done in one way or another or they are going to kind

21    of if not by preclusion, not that way.  Just by the fact of a

22    decision being made, they are going to be stuck with what goes

23    on in another case if cases are severed.

24         THE COURT:  If they were stuck with what went on in

25    another case, you know, they might have some opportunity -- you

1   would certainly have the opportunity.  They might or not have

2   the opportunity to actually argue against it, I guess, depending

3   on how the hearing was held?

4       MR. COTTER:  Agreed.  They would have that opportunity.

5       And I'm not saying it's like a preclusive effect.  It

6   seems to me that you can organize a hearing on Markman along

7   with discovery with the three parties here.  It's not unwieldy.

8   We've got three defendants.  We don't have forty defendants.

9   You don't have twelve defendants.  It's a case that can be

10  managed.  And parties have to make decisions and will have to

11  figure out their own positions.  And if they have a different

12  view, they will have to take that different view before your

13  Honor and argue for it.

14      There is no reason they have to all compromise on their

15  claim construction positions if they are in the same case, just

16  as it is when they are in separate cases.

17      Do you have any questions about the procedure?

18      You mentioned to Mr. Summersgill -- you had questions

19  about the procedures about how to sever.  We don't feel it needs

20  to be severed.  If there is any question of severing, that could

21  be deferred until we get to the Pretrial Conference and figure

22  out how things will be managed there as you alluded to in the

23  Rule 16 Conference.

24      Simply put, you've got three defendants.  We never said

25  they had the same products.  They have different products.

1        THE COURT:  No, no.  That I know.  Everybody knows they

2    have different products.

3        MR. COTTER:  And there are similarities between those

4    products.  And there are similar issues that will be addressed.

5    That's on infringement alone.

6        If you take invalidity, the issues are going to be

7    largely the same.  In fact, the complaints by all three

8    defendants that if defendant one is in a case with defendants

9    two and three and to have to talk about -- to have a jury see

10   things about defendants two and three at the same time as we're

11   talking about infringement of defendant one, the problem with

12   that is not that the jury will be confused.  The jury is going

13   to have issues to deal with other products anyway which each of

14   the defendants have raised in their invalidity contentions.

15       THE COURT:  They are not going to go to trial together.

16   So that kind of confusion, you don't have to worry about that.

17       MR. COTTER:  Okay.  Thank you, your Honor.

18       As far as any problem with dealing with the case as it

19   proceeds up to the point of the Pretrial Conference through

20   discovery and Markman, there are going to be issues involving

21   other defendants' products even if you severed the case now.

22       For example, Hamilton has raised in its invalidity

23   contentions, the products of Draeger and Maquet as being prior

24   art products.

25       Similarly, Maquet has mentioned in its invalidity

1    contentions, the products of other defendants as being prior art

2    products.

3            THE COURT:  If it's presented and Maquet is saying,

4    Hamilton prior art product means it's invalid for that reason or

5    this reason, and Maquet is the only defendant, I don't see there

6    being much confusion when presumably there's an array of

7    different arguments being advanced that as long as long as

8    Hamilton is not sitting there next to them, that may start to

9    get confusing.

10           In any event, unless there was a some joint trial on

11   invalidity or something, they are not going to be tried

12   together.  They are not going to have infringement tried

13   together.  I sort of doubt that you want to have the other stuff

14   tried together.

15           MR. COTTER:  In terms of the management of case, just

16   turning to the case before you gets to trial, we have a

17   situation where the defendants have presented to the Court what

18   they said was an agreed schedule for discovery, Markman, leading

19   up to trial.  It's difficult for me to understand how they can

20   turn around in their briefing on this motion and say there isn't

21   enough time.

22           THE COURT:  I don't think they said there wasn't enough

23   time.  You mean time to do inventors deposition or something?

24           MR. COTTER:  Yes, yes.

25           THE COURT:  Sorry.

1          MR. COTTER:  Discovery, I believe they said they don't

2     enough time to do it the way they want to do it.

3          THE COURT:  I didn't take that to be time in the sense

4     of -- and maybe not the way that you mean it either, between now

5     and the trial date.  But so many hours, that's what you mean,

6     right?

7          MR. COTTER:  That's what I'm focusing on, your Honor.

8          The limits on discovery, the schedule for discovery was

9     all agreed to with the understanding that there wouldn't be for

10    the purpose of presenting the joint schedule or whatever

11    schedule people want to present different schedules.  And let's

12    say we presented basically a joint schedule -- assume there

13    would be no stay, assume the case wouldn't be severed and the

14    parties, the defendants were able to say this is the schedule

15    that would work, these are the number of depositions that would

16    work.  So to come now and say it won't work, doesn't ring true.

17         THE COURT:  All right.

18         I think I understand your position.  So why don't we go

19    on and move to the other argument, the motion for a stay?

20         MR. RILEY:  May I make two points on it?

21         THE COURT:  Did you make them in your brief?

22         MR. RILEY:  Yes.

23         THE COURT:  No.

24         The Motion to Stay.  Who is arguing that?

25         Mr. Summersgill?

1          MR. SUMMERSGILL:  Thank you, your Honor.

2          We believe the stay should be granted for three

3     reasons.  First, this is not a garden variety typical reexamine.

4          THE COURT:  Why is that?

5          MR. SUMMERSGILL:  Unlike many reexamines, we rely

6     primarily on a single reference, the '777 Olsen reference, a

7     patent from 1990.  That in our view and in our experts view very

8     clearly discloses -- anticipates.

9          THE COURT:  I understand and perhaps Cotter will get up

10    and say, -- I doubt that he will agree with you.  And I guess

11    what I'm wondering is, let's assume that you are right, this is

12    atypical, what difference does it make?

13         MR. SUMMERSGILL:  I think it makes a difference.

14         I will say so far the Patent Office has agreed with our

15    expert.

16         THE COURT:  Has the Patent Office, from what I got from

17    the briefing was that they had granted the reexamine and said

18    something about substantial question.

19         MR. SUMMERSGILL:  They did a little bit more than that

20    which is little bit atypical.  They granted the reexamine.  In

21    the grant of the reexamine, they said that all of the claims --

22    all of the asserted claims should be rejected.  And that's

23    atypical.

24         THE COURT:  Atypical in the sense is they said all of

25    them are as opposed to some of them?

1          MR. SUMMERSGILL:  Often times they will just say the

2     reexamine raises a substantial question of patentability.  In

3     this one, they laid out in detail why the claims should be

4     rejected.

5          Now, they haven't formally rejected it.  There has not

6     been an office action.  But they gave a very strong indication

7     that they will be and for the reasons we laid out in our brief.

8          THE COURT:  I did look at the reexamine, I guess

9     notice, whatever its called.  And I did see that they -- some

10    combination of three prior art things.  They rejected all the

11    claims and rejected some of them on multiple bases.

12         I don't know -- I don't have enough experience to know

13    whether that's usual or unusual.  Even if it's unusual, whether

14    it being unusual is an indication that there's more merit to the

15    request than some other time when they grant the reexamine.

16         MR. SUMMERSGILL:  Here why we think it's relevant.  We

17    do think it indicates that it's got merit than the typical

18    reexamine.  That's one of the factors that the Enhanced Security

19    case, I believe it was Judge Farnan, the fact that all of the

20    asserted claims had been rejected and were then in reexamine,

21    the fact that that court considered in granting the stay.

22         THE COURT:  Just in terms of the timing, because I

23    think the reexamine was maybe -- was it January 10th that it was

24    granted?

25         MR. SUMMERSGILL:  It was filed in November, 2010.  I

1    think it was mid-January that it was granted.

2         THE COURT:  January 10th.  Somewhere around that.

3         I'm sorry, Mr. Jones?

4         MR. JONES:  It was January 10th.

5         THE COURT:  That's all right.

6         Is it the case that under the rules the plaintiff has

7    60 days to do something?

8         MR. SUMMERSGILL:  They have to file an Inventor's

9    Statement.

10        THE COURT:  Is that because it's ex parte?  Is that

11   something that you know about whether or not they did it or not?

12        MR. SUMMERSGILL:  We'll know about everything because

13   they have got to file publicly with the PTO.

14        In terms of the timing, the average time for

15   reexamine --

16        THE COURT:  Have they filed that?

17        MR. SUMMERSGILL:  They have not.

18        THE COURT:  Am I wrong about the 60 days?

19        MR. SUMMERSGILL:  I think there's time to do so has

20   passed.  They don't necessarily have to file that.  Most

21   patentees don't file for certain reasons.

22        I believe that time to file that has passed.

23        THE COURT:  So what is the next step?

24        MR. SUMMERSGILL:  The next step will be the first

25   office action which we expect will reject all of claims.

1              THE COURT:  That's your optimist view?

2              Leaving that aside, when is it that you expect the

3    first office action to occur?

4              MR. SUMMERSGILL:  At any time, your Honor.  We frankly

5    expected it before this hearing and we had hoped to have

6    received it before this hearing.

7              In terms of normal timing, it should come at any time.

8              THE COURT:  Okay.

9              All right.  Go ahead.

10             MR. SUMMERSGILL:  According to the PTO, as we indicated

11   in our brief.  77 percent of claims are either rejected or

12   amended during ex parte reexamination proceedings.

13             THE COURT:  I looked at those figures.

14             As I recall, wasn't it roughly on the order of one

15   quarter of time the claims are a hundred percent confirmed, one

16   eighth of the time the claims are 100 percent rejected and the

17   rest are somewhere in between?

18             MR. SUMMERSGILL:  Yes.  We're certainly not suggesting

19   that 77 percent of the time a hundred percent of the claims are

20   rejected.  But the odds that a good number of the claims are

21   ultimately rejected --

22             THE COURT:  If one claim out of, I forget how many

23   exactly you put forward here, let's say around about 15.  I

24   think maybe it was less than that, but whatever it was.  If one

25   claim is rejected and 14 survive, that would count as part of

1   the 77 percent, correct?

2          MR. SUMMERSGILL:  Correct.

3          If four or five independent claims asserted gets

4   ultimately rejected or amended, that would have a major impact

5   on this lawsuit.

6          THE COURT:  I can't remember.  I didn't look at it.

7   How many of the claims that you've submitted are independent

8   claims?

9          MR. SUMMERSGILL:  I think 5 of 17 off the top of my

10  head.

11         The broadest claim, for instance, not surprising is one

12  of the independent claims, we think probably most likely to get

13  ultimately rejected.

14         The point is, your Honor, that there is a high

15  likelihood at least some, and we are optimistic, we think given

16  this reference, all the claims will get ultimately rejected or

17  amended or they will be forced to make narrowing arguments.

18         If we proceed on the current claims and ultimately they

19  are rejected, we've all wasted a lot of time and resources.

20         If we proceed and they are amended, we've got to redo a

21  lot of proceedings including claim construction.  And we've

22  wasted a lot of time.

23         If they make narrowing arguments, we will have to redo

24  at least some of the proceedings because we would be entitled to

25  present that at claim construction.

1          So given the high odds that some of these claims, if

2    not all of the claims get rejected, amended or narrowed, I think

3    it makes more sense to stay the case.

4          And the third point is that because Ventronics is a

5    non-practicing entity in particular and doesn't make or sell any

6    competitive products, they are not a competitor of any of the

7    defendants, they won't suffer any prejudice.

8          That's something that the Enhanced Security, Vehicle IP

9    and Gioello cases all considered very important in granting

10   stays.

11         In particular, in the vehicle IP and Gioello cases,

12   they noted of particular importance in finding no prejudice,

13   that the plaintiff was a non-practicing entity.

14         And that's exactly --

15         THE COURT:  The case or cases that you cited, they were

16   which?

17         MR. SUMMERSGILL:  Vehicle IP case and the Gioello case.

18   In contrast, your Honor, the cases that the plaintiff cites to

19   are very distinguishable.

20         In Belden --

21         THE COURT:  The one I forget which name it was, the one

22   where the motion was a week before trial, that's pretty

23   distinguishable.

24         MR. SUMMERSGILL:  That's the Belden case.  And the

25   Helicos case, the party was a direct competitor.  And the motion

1    was filed only two months before the end of discovery.  And in

2    the Oracle case, the defendant actually, the DJ plaintiff moved

3    for the stay two years after expert and fact discovery were

4    disclosed, after claim construction and Summary Judgment and

5    after Summary Judgment had been appealed to the Federal Circuit,

6    and they were the plaintiff.  It could have filed.

7              THE COURT:  Which case is that?

8              MR. SUMMERSGILL:  The Oracle case, your Honor.

9              THE COURT:  Was that Judge Robinson?

10             MR. SUMMERSGILL:  I believe it was, your Honor.

11             Those are the three cases they rely on.  All three of

12   those are very different.

13             We're much closer to the Gioello and Enhanced Security

14   cases.

15             THE COURT:  What I got from the documents you submitted

16   was that the arguments in the Patent Office are based on

17   anticipation and obviousness, right?

18             MR. SUMMERSGILL:  Correct.

19             I will say, your Honor, primarily anticipation.

20             THE COURT:  All right.

21             In your defenses here, you've got all kinds of other

22   defenses including a defense of invalidity, indefiniteness, for

23   example, right?

24             MR. SUMMERSGILL:  That's true, your Honor.

25             THE COURT:  And so those arguments are going to be

1     dealt with, right?

2          MR. SUMMERSGILL:  That is true, your Honor.

3          THE COURT:  And this is essentially a one way ratchet,

4     right, if they lose, you win, if they win, you get to argue

5     again, right?

6          MR. SUMMERSGILL:  Your Honor, some Courts have proposed

7     this:  We'd be willing to submit that if the Patent Office

8     ultimately rejects our reexamine, that we won't argue invalidity

9     on the Olsen '777 reference.

10          As Cotter mentioned, we do have Hamilton prior art

11     systems.

12          THE COURT:  You have other invalidity references that

13     you could still argue?

14          MR. SUMMERSGILL:  Yes, because it's tied.  Because they

15     operate the same way that our accused products do.  If our

16     accused products infringe, then our prior art products

17     invalidate.

18          THE COURT:  So this offer of being -- what was it, you

19     would be bound by the Olsen reference, is that the position of

20     your other two defendants?

21          MR. SUMMERSGILL:  I can't speak on their behalf of the

22     Olsen reference.  Hamilton won't try to reargue the Olsen

23     reference if the patent office says it doesn't anticipate or

24     renders obvious the claims.

25          THE COURT:  And in terms of the Patent Office, I forget

1    the statistics, exactly, it could be easily a couple of years

2    before the dust or smoke clears, right?

3           MR. SUMMERSGILL:  Your Honor, it's typically -- the

4    proceedings at the Patent Office are on average two years.  I

5    think the latest are 18 to 24 months.

6           Now, Ventronics points to the fact that it's then

7    subject to appeal after that 18 to 24 month period.

8           If we're in that period, that means the Patent Office

9    finally rejected the claims.  That's why they are appealing

10   them, and therefore, we all have wanted to stay the case

11   otherwise --

12          THE COURT:  I can see that.

13          And because it is ex parte, if the Patent Office says

14   your claims are good at some point, that's the end of it, right?

15          MR. SUMMERSGILL:  Right.

16          THE COURT:  You can't cause an appeal to be made, this

17   is really between them and the Patent Office?

18          MR. SUMMERSGILL:  Correct.

19          Is there anything else that you want to say about the

20   stay?

21          MR. SUMMERSGILL:  I think that covers it, your Honor.

22          THE COURT:  Do either of you have something that you

23   want to say about the stay?

24          MR. RILEY:  No, your honor.

25          MR. JONES:  I do, your Honor.

1          THE COURT:  Mr. Jones, you can say it from there.

2          MR. JONES:  I think I would say for Draeger, we have

3    not considered whether or not we would want to be bound by the

4    PTO regarding the Olsen reference.  And so today, I would be

5    unlikely to commit to be bound by what the PTO may decide on

6    that.

7          THE COURT:  I would think it would be something that

8    you if you thought about it in advance, you couldn't commit

9    today?

10         MR. JONES:  That's right.

11         Second thing is on this two year period for PTO on

12   reexamination.  I've been through many reexaminations.  My

13   experience has been that the PTO will act very quickly.  And

14   arguments about the delay, plaintiff, if they were not going to

15   file the Plaintiff's Statement, the Patentee's Statement during

16   this 60 day period, they could have alternatively filed the

17   statement that says we're not going to file one, the PTO would

18   have moved forward with an office action.

19         They already outlined in the office action their

20   recommendations what their grounds were.  They have a

21   recommended grounds of rejection.  And they laid it out.

22         Dollars to donuts, what we're going to see in an office

23   action is a quote where they just cut that out and put it in the

24   office action.  That could have already have happened if they

25   had simply filed the statement saying, we're not going to file

1    an Inventor's Statement.  The delay is already on their part

2    here.

3              While I'm on my feet, I would want to say if I get the

4    chance, I would like to add a couple more comments when it's

5    convenient about the severance issues about our issues being all

6    tied together.

7              THE COURT:  Got you.

8              MR. JONES:  Thank you.

9              THE COURT:  Mr. Cotter.

10             MR. COTTER:  There's nothing that really distinguishes

11   this reexamination grant from all the others that are granted in

12   ninety one or so percent of the cases.

13             Mr. Summersgill's comments that it's something

14   exceptional about this one, that's not been my experience.

15             And the PTO frequently, depending on whatever examiner

16   is handling the reexamination will go on at great length

17   adopting largely what the person requesting the reexamination

18   says as the statement of the PTO in granting the reexamination.

19             THE COURT:  If the first office action says it's not a

20   rejection of all the claims.

21             Let's say the first office action is, you know, we've

22   looked at it and we don't think this Olsen patent is relevant to

23   anything, and they are all good.  Is the PTO action then over?

24             MR. COTTER:  It can be.

25             THE COURT:  Who would keep it alive?

1          MR. COTTER:  No one would unless the PTO had some other

2   grounds for rejection.

3          THE COURT:  If the examiner who has it upon the first

4   office action goes in your favor, then the case even if it were

5   stayed, is subject to being brought back to life?

6          MR. COTTER:  Sure that could happen.

7          THE COURT:  I gather that statistically, maybe I'm just

8   making this up, don't agree if I'm wrong, but the most likely

9   thing the first office action will reject the claim, right?

10         MR. COTTER:  That's what the defendant says.  I don't

11  have any reason to disagree with that.

12         THE COURT:  All right.  So, go ahead.

13         MR. COTTER:  Without there being nothing exceptional,

14  this is just the initial paper from the PTO.

15         And the timing is -- you know, the comment about the

16  average, I think I heard, I don't know want to misquote, but I

17  thought I heard Hamilton say the average is about 18 months.

18  That's not correct.

19         THE COURT:  He said 18 to 24.

20         MR. COTTER:  I think it's more like 30 is the median

21  time frame from the most recent statistics.

22         How is that going to affect this particular

23  reexamination?  I don't know.  I don't know how I can provide

24  you with an expectation of how fast the PTO is really going to

25  operate.

1          THE COURT:  You know, other than having the idea that

2    it's not going to happen tomorrow, it's a decent amount of time,

3    whether it's 18 months or 30 months, that's a ways from now,

4    right?

5          MR. COTTER:  Yes, it is a ways from now.

6          To your Honor's point, it could even be done very, very

7    soon.  But the chances statistically are that it won't be.

8          For this case, we don't know what's going to happen.

9    There is nothing exceptional about the PTO taking references

10   that are cited by someone petitioning for reexamination and

11   saying, yeah, we copied out of your request for reexamination

12   and put that copy of what you said and changed the voice for our

13   grant of reexamination and then going from there.

14         So there is really nothing exceptional.  Again, that is

15   something that we could provide you with examples of if you

16   want?

17         THE COURT:  I don't think you could provide enough

18   examples for any statistical significance without killing me.

19         Maybe sometime in the future I'll have seen enough

20   myself to have some sense.  But right now, no.

21         MR. COTTER:  As far as the comments about the cases

22   that are relied upon, I think if you look at the Helicos case

23   and the statement, that was a competitor case.

24         I think actually what happened is the Court decided

25   that Helicos said enough that it was still sort of in the market

1    because it still had some of its machines out there.  Some kind

2    of PTR machines, something like that.  They were still out in

3    the market.  Even though Helicos is not today or as of December

4    when the arguments were held selling those machines.  Its

5    business had morphed.

6           Similarly here, while you do have Ventronics that is a

7    separate entity owned and controlled by the same people who own

8    and control Cardio Pulmonary Corporation, CPC, which originally

9    owned patents and a signed them to Ventronics.

10           CPC continues to be in the market in one specific way

11   and one way more generally.

12           The specific way is CPC still has products that are in

13   use in the market.  It's not actively selling.  Like Helicos is,

14   it has ventilators that it made and sold.

15           THE COURT:  How is Ventronics affected if CPC has

16   trouble selling ventilators?

17           MR. COTTER:  CPC doesn't sell ventilators anymore.

18           THE COURT:  I thought your brief said something about

19   network or something.

20           MR. COTTER:  That's the general point in which is that

21   CPC sells networking software today and has for about ten years.

22           THE COURT:  Let's say CPC sells networking software and

23   is adversely affected, it's not a party.  I don't mean anything

24   rude.  But why do I care?

25           MR. COTTER:  I think I understand your point.

1          Your honor, it's true that CPC is not a party.  And

2     there are separate entities with Ventronics and CPC.  But also

3     the fact of the matter is, it's not like CPC is an intellectual

4     ventures type company or a company that has no involvement and

5     never had any involvement in the marketplace.

6          The Ventronics entity that's been formed to bring this

7     suit, to keep the suit against Ventronics as a separate entity,

8     however, it has the same management.  And, in fact, any money

9     that comes out of the case will go to the same owners.  That's

10    how the case will affect the people who control CPC.

11         I can't tell you directly that it affects CPC as an

12    operating entity.

13         THE COURT:  Okay.

14         All right.  I am correct in thinking that there to

15    date, there have been no depositions in this case?

16         MR. COTTER:  The only depositions that I'm aware of

17    were on venue matters.  I don't know how much -- at least, maybe

18    defense counsel can include me on others.  I don't know whether

19    any of that testimony will be of value to the rest of case.

20         THE COURT:  I was surprised, actually, to see that Mr.

21    Shanahan was not the plaintiff's counsel anymore.

22         Have you been involved in the case the whole time or

23    are you fairly new to the case now?

24         MR. COTTER:  I am new as of shortly before entering my

25    appearance, your Honor.

1          THE COURT:  When was that?

2          MR. COTTER:  Mid-February.

3          THE COURT:  All right.

4          But in terms of substantive depositions or depositions

5     relating to the main event, that's obviously off in the

6     distance, some period of time away?

7          MR. COTTER:  Right.  But the distance is coming upon us

8     quickly as we have a the close of discovery in November.

9          THE COURT:  In terms of documents, I saw in the

10    briefing there is some number.  I want to say 300,000.  I could

11    be off or I could be confusing this with something else.

12      There's been a lot of paper.  Probably not paper, but a lot

13    of documents that have been exchanged back and forth.

14          MR. COTTER:  Yes.  It's fair to say I think we had

15    330,000 pages.

16          I know there is more discovery to go on.  But my

17    understanding is that the parties have responded on the issues

18    that relate to infringement and invalidity.  I'm sure there will

19    be further document production.  But my understanding is that is

20    now in the later phases.

21          THE COURT:  Actually, it occurs to me then, the briefs

22    that I read on behalf of Ventronics, you didn't write them, they

23    were written before you were in the case?

24          MR. COTTER:  No.  The one on this opposition was by us.

25    I don't know the exact date of appearance.  It was shortly

1    before this brief was filed and our name is on this along with

2    Mr. Shanahan.  He had not left the case at that point.

3            THE COURT:  Oh, yes, I see your name.

4            All right.  So, besides the depositions, it's clear,

5    there has been no Markman briefing, no expert reports, we're way

6    before Case Dispositive Motions.  And the Motion to Stay was

7    actually before we had the Rule 16 Conference, right?

8            MR. COTTER:  I believe it was.

9            MR. SUMMERSGILL:  Yes, your Honor.

10           MR. COTTER:  But there has been substantial

11   interrogatory responses that have been filed.

12           There was one error in one of the briefs saying there

13   had been no specific interrogatories filed or responded to.

14   That's not correct.

15           I believe Draeger has responded to specific

16   interrogatories.  And all defendants have responded to general

17   interrogatories that come out as a matter of course in the Texas

18   procedure.  And those are substantive documents.

19           In addition, there are invalidity contentions that the

20   defendants have had to serve and the infringement contentions

21   that the plaintiff has had to serve.  They are called

22   preliminary, but they are very detailed.  And they go on for,

23   you know, dozens or hundreds of pages.

24           THE COURT:  I saw hundreds of pages.  It seems like a

25   lot of contentions.

1          THE COURT:  All right.

2          Is there anything else that you want to bring to my

3     attention in relation to this?

4          MR. COTTER:  As long as you understand that the stage

5     of discovery, I think that's good.

6          THE COURT:  All right.

7          Thank you, Mr. Cotter.

8          I do have one, I guess, one other question, which is

9     the claims that you have against Maquet.

10          There are two patents involved there.  And I am looking

11     at the accused product, which I think for Maquet, for the '160

12     patent described as an Servo-Ventilator device.  And for the

13     other patent it's referred to as Servo-Ventilator device

14     equipped with an Auto-Mode feature.

15          Do you know whether the other patent is primarily

16     directed at the Auto-Mode feature or does it cover both the

17     Servo-Ventilator guts, for lack of a better word, and the

18     Auto-Mode feature?  I'm trying to figure out whether the patent

19     that is not under reexamine, what exactly it covers.

20          MR. COTTER:  Without getting into the claim

21     construction part of it, I think it's safe to say that the '973

22     patent which is the later one and the '160 both cover the Maquet

23     Servo-i product.

24          As far as the Auto-Mode feature of that, I'm not sure

25     if that appears in all Servo-i's or not.  But that is part and

1    parcel of our case on the '160.  And part and parcel of our case

2    on the '973.

3              THE COURT:  Auto-Mode?

4              MR. COTTER:  Yes.

5              THE COURT:  Strange, because the Complaint

6    differentiates between the two products.

7              MR. COTTER:  I can't answer your question without

8    anymore specificity than that right now.

9              THE COURT:  Okay.

10             MR. COTTER:  My understanding, we're talking the same

11   basic device with respect to both patents.

12             Whether the Auto-Mode is required in order to show

13   infringement of the '973 but not required for the '160, that

14   slips my mind right now.

15             THE COURT:  All right.  I think I've got that.

16             Is there anything, Mr. Summersgill, or other counsel

17   that you want to say about the stay that's additional?

18             MR. SUMMERSGILL:  Nothing from Hamilton, your Honor.

19             MR. RILEY:  No, your Honor.

20             MR. JONES:  No, sir.

21             THE COURT:  All right.

22             In terms of the stay, when considering a Motion to

23   Stay, there are three factors, whether the stay will simplify

24   issues at trial, whether discovery is complete and the trial

25   date is set and whether granting the stay would cause the

1    non-moving party to suffer undue prejudice from any delay.

2            As set forth in a lot of Delaware cases including

3    Vehicle IP LLC versus Walmart Stores, 2010 Westlaw 482, 3393.

4            And in considering those factors, whether the stay will

5    simplify issues at trial, the '160 patent is the basis for all

6    the claims against Hamilton and Draeger.

7            The reexamine has been granted, as I understand it, it

8    covers all the claims that are asserted on the '160 patent.

9            Obviously, there are a lot of issues that are not

10   addressed in the office action because the office action is only

11   dealing with anticipation and obviousness based on very limited

12   prior art.

13           I appreciate Hamilton's attorney saying they do

14   anticipation and obviousness based on other arguments if they

15   lost, even if the Olsen reference was out.

16           Of course, besides the invalidity defense, there are

17   all sorts of other defenses.  So, there are lots of things that

18   would be left for trial even if there was some resolution of the

19   issues because of actions of the Patent Office.

20           On the other hand, the possibility of a clean sweep is

21   out there.  And it does seem that since the reexamine is granted

22   on sort of the basis of one -- mostly on the basis of one piece

23   of prior art, that the Patent Office might be inspired to move

24   more quickly because maybe the analysis is more straightforward.

25           In any event, in terms of simplification, I think the

1    odds are that the Patent Office won't throw out the patent.  But

2    there seems to be, you know, some chance that they might

3    invalidate entirely.

4         The other thing is based on what Mr. Summersgill said,

5    does seem like there will be some clue as to maybe which

6    direction they're going based on that first office action pretty

7    soon.

8         Maybe this is not as strong a case where they already

9    had a first office action or some subsequent office action

10   invalidating patents.  But it is teed up pretty well to possibly

11   simplify the issues by making the cases against Hamilton and

12   Draeger go away.

13        In terms of discovery, whether it's complete and trial

14   date is set.  A trial date is set.  I think it's September 16,

15   2013.

16        On the other hand, the trial date was set after this

17   motion was filed.  And it is it still an a year and a half ago

18   from now.

19        Discovery, you know, it's not right at the beginning,

20   certainly not right at the end.  There essentially have been no

21   meaningful depositions.  Much of the case remains to happen.

22      The Markman briefing hasn't occurred.  No Markman Hearing.

23   No expert reports.

24        There have been some discovery motions and there has

25   been the exchange of a lot of documents.

1    There have been contention interrogatories, general

2    specific interrogatories.  So the case is, I would say closer to

3    the beginning than the end, but it's not -- it hasn't reached

4    the middle yet.

5    I don't think it's -- it hasn't reached a lot of the

6    expense that's involved with the case because with the fact that

7    the claim construction briefing hasn't been done, the experts

8    don't appear to have been hired.

9    Even though the trial date is set, it's long in the

10   future and was set after this motion was filed.

11   In terms of whether granting the Motion to Stay would

12   cause the non-moving party to suffer undo prejudice from any

13   delay, Ventronics is not a competitor.  If it's a non-practicing

14   entity, it's pretty close to a non-practicing entity.

15   I don't think that CPC is a non-moving party.  I think

16   it's just a party.  It's not a party.  It's just an entity

17   that's out there.

18   And basically Ventronics is seeking damages in the

19   case.  And if there's a stay, there still would be damages at

20   the end of the line.

21   Some other considerations I think that were raised in

22   the briefing is that -- I don't think Hamilton was dilatory in

23   seeking the ex parte reexamination.

24   I did look at the submission it filed.  It certainly

25   looked like an impressive document to me.  I don't know if it

1    has any merit.  It certainly -- I can understand why it took

2    sometime to get it together.

3         And Hamilton did then file its briefs and appendix in

4    this Court less than a month after the PTO granted the

5    reexamine.  So I don't see Hamilton and the other defendants,

6    but for some reason went on in doing this.  I thought Hamilton

7    was sort of the lead defendant on this, right, because they

8    filed the request for the ex parte action.  So, I think they

9    were.

10         I don't see this as the timely request for the stay

11    evidencing the intent for an inappropriate tactical advantage.

12         So, taking all these things into consideration, I am

13    going to stay pending reexamine.  Maybe if I had more -- thought

14    about it more, I would not have had the Rule 16 Conference while

15    this was pending even though I think maybe the conference got

16    scheduled and the motion was filed.  I'm not really sure about

17    that.

18         One thing, the reason that I was asking about Maquet,

19    because I wasn't really sure, but it seems is like Maquet has

20    extra issues because there was an extra patent involved, which

21    maybe is good enough for the plaintiffs to go forward on, maybe

22    it's not.  I'm not really sure.

23         So, I'm going to stay the entire case.  If the

24    plaintiff wants to lift the stay, the plaintiff and Maquet

25    probably should talk to each other.

1           If they want to lift the stay in regards to the one

2    patent, I just haven't thought that through enough.  And I

3    would, you know, if there was a motion filed, I would consider

4    it.  So that's what I'm going to do in regards to the stay.

5           In regards to the Motion for Severance.  I don't like

6    it because I think it's going to make my life miserable.  But I

7    do think that the defendants are mis-joined under Rule 20.

8    That's what I thought when I wrote the opinion in Wacoh, but I

9    didn't actually have to decide it back then.

10          I do believe that -- and it was news to me today, some

11   of the things that were agreed to in Texas, that happened about

12   because of the rules in Texas, they had escaped my attention

13   before today.

14          So, it may be the case that when the stay is lifted

15   depending on when that is, that we may have to have a conference

16   and revisit some of these issues because I'm not sure that I

17   really agreed with what I understand to have been -- that has

18   happened because of the rules in Texas.

19          And then the other thing is, I would like to have a

20   status report on what the Patent Office was up to in regards to

21   this reexamine.

22          And I am wondering if there is a suggestion as to

23   what's a reasonable time so when there should be a status

24   report?

25          I certainly don't object to getting something if the

1     Patent Office does something noteworthy before the date.

2            But in terms of trying to make sure that it doesn't

3     fade from the horizon.

4            Mr. Cotter, do you have a suggestion as to when a

5     status report should be?

6            MR. COTTER:  I don't know that is going to do much good

7     at the point.  When the Patent Office issues the first office

8     action, it might be better -- unless that is one that says

9     there's no issue here.

10           THE COURT:  That's the thing.  If they do that, then

11    bring it to my attention and we'll be.

12           I'm sort of thinking, if the status report is somewhere

13    down the road, Not much has happened, Judge.  But we just want

14    to remind you, Judge, that we're here.

15           MR. COTTER:  I would say six months from, you know,

16    periodically on a six months basis.  If there is a need to let

17    you know earlier as long as you would not object to us telling

18    you that?

19           THE COURT:  I would not.

20           Mr. Summersgill, six months?

21           MR. SUMMERSGILL:  That's fine, your Honor.

22           THE COURT:  Counsel for the other defendants?

23           MR. RILEY:  Fine.

24           THE COURT:  Draeger?

25           MR. JONES:  Just a question for clarification.  If

1      indeed, the PTO does respond rather soon since on the basis of

2      what we said or something else says, we do reject all the

3      claims.  Would you be interested in hearing about that?

4              THE COURT:  I would be interested, but that could be --

5      let me think about that.

6              No.  Actually, what am I going to do is just wait the

7      six months.  You can say then, yeah, three months ago the first

8      office action was this.

9              And you don't need to submit appendices and stuff.  A

10     one page letter would be enough.  And I would hope that counsel

11     could probably agree that the plaintiff could just submit it.

12             I don't need to get four one page letters.

13             MR. JONES:  Buyers remorse, that it indeed did happen.

14             THE COURT:  Buyers remorse will be at the end of the

15     process, not the beginning.

16             MR. JONES:  Okay.

17             THE COURT:  Anything else?

18             Yes, Mr. Cotter.

19             MR. COTTER:  I assume your Honor would have no

20     objection to hearing about the reexamination at any time if

21     we're talking about what's going on in the reexamination in the

22     context of the '973?  I'm not sure what I'm going to want to and

23     what my client is going to want to do with the '973.

24             THE COURT:  No, that would be fine.

25             Basically, what I'm trying to say is, I'd like to make

1    sure I get a status report in six months.

2              If you all use your judgment and think that I should be

3    told about something that's going on, I'm not going to be upset,

4    okay?

5              MS. LOUDEN:  Just on your point about hearing further

6    on the scheduling issues.  When we come back, I just want to

7    point out that the Scheduling Order was entered not just in

8    Texas but here in Delaware.

9              THE COURT:  I do remember doing that.

10             I don't remember quite as much buying into the Texas

11   Scheduling Order, but apparently I did.

12             Anything else?

13             (No response)

14             THE COURT:  All right.  Thank you.

15             (At this time, the hearing concluded)

16

17

18

19

20

21

22

23

24

25